NOTICE

Decision filed 07/31/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240206-U

NO. 5-24-0206

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wabash County. |
| | ) | |
| v. | ) | No. 22-CF-88 |
| | ) | |
| ZACHARY B. REED, | ) | Honorable |
| | ) | William C. Hudson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the trial court's decisions regarding the admission of certain evidence at trial. However, we vacate the defendant's sentences on two of his eight convictions, as the trial court erred in finding that there was a single course of conduct, and we remand for resentencing.

¶ 2    Following a jury trial, the defendant was convicted of eight counts of child pornography (720 ILCS 5/11-20.1(a)(1)(iii), (a)(1)(vii) (West 2022)). Thereafter, the circuit court of Wabash County sentenced him to a total of 60 years in the Illinois Department of Corrections (IDOC). The defendant appeals, arguing that (1) the trial court committed plain error in admitting an interview video of the child victim, or alternatively, his trial counsel provided ineffective assistance in failing to object to the admission of this video into evidence; (2) the State elicited improper expert witness testimony from the investigating police officer, or alternatively, his trial counsel provided

1

ineffective assistance in failing to object to this testimony; (3) the defendant was only subject to one child pornography conviction under the principle of unit of prosecution; (4) his multiple child pornography convictions violate the one-act, one-crime rule; (5) his 60-year sentence should be vacated, and the cause remanded for resentencing, because the trial court used the wrong sentencing range when determining his sentence; and (6) his sentence was excessive. For the reasons that follow, we affirm in part, vacate in part, and remand for resentencing.

¶ 3                                    I. BACKGROUND

¶ 4      On September 26, 2022, the State charged the defendant with eight counts of child pornography. The victim, K.L., was 12 years old at the time and was the daughter of N.L., the defendant's then-girlfriend. K.L. resided with the defendant and N.L. at the time. The charges stemmed from video that was taken with a motion-activated camera disguised as a USB charger discovered in the family bathroom primarily used by K.L. The charges were based on 7 of the 78 video clips that were found on a mini-SIM card that was housed in the hidden motion-activated camera, as well as a still image that appeared to be taken from one of the video clips. The video clips depicted K.L. in acts of masturbation, and the still image showed her naked buttocks as she entered the shower.

¶ 5      On August 28, 2023, the State filed a motion to admit evidence of other bad acts, in which the State sought to admit evidence of a previous incident where the defendant had allegedly attempted to record K.L. while in the bathroom. K.L. reported the incident during a Child Advocacy Center (CAC) interview that was conducted as part of the investigation into this case. Specifically, K.L. reported that between December 21, 2021, and September 21, 2022, she was about to take a shower when she noticed that the defendant's cell phone, which was charging in the bathroom, was recording. She noted that the cell phone was propped up and angled toward the

2

shower. K.L. reported the incident to her mother, who spoke to the defendant, and the defendant claimed that it was an accident. K.L. believed that the incident was an accident and that the phone was propped up to charge. The State sought to introduce this evidence to establish identity, intent, common scheme or design, *modus operandi*, and propensity. The State contended that the act occurred close in time, or at the same time, as the alleged acts in this matter and was similar to the predicate offenses, as the recording took place in the same place and was of the same victim. In addition, on August 29, 2023, the State filed notice of its intent to offer out-of-court statements K.L. gave to the investigating detective immediately after the CAC interview.

¶ 6 On September 1, 2023, the trial court held a pretrial hearing, at which the State's motion to admit evidence of other bad acts and notice of intent were addressed. During the hearing, defense counsel did not object to the State playing the CAC interview for the jury. However, counsel did oppose the admission of out-of-court statements K.L. made following the CAC interview upon learning about the images and videos of her taken by the hidden camera. Counsel argued that the post-interview statements were not recorded and that they were hearsay without any applicable exception. Following arguments, the trial court granted the State's motion regarding the evidence about the previous recording incident. Also, the trial court admitted K.L.'s post-interview statements over defense counsel's objection, finding that the statements satisfied the requirements of section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2022)), which governed the admissibility of hearsay in certain cases, including child pornography cases.

¶ 7 On September 5, 2023, the jury trial commenced, and the following testimony was presented. K.L. testified that she was 13 years old,[1] she was the oldest out of her six siblings, and

---

[1]K.L. was born December 21, 2009, and she was 12 years old at the time of the incident at issue here.

she lived with her father. However, previously, she had split her time between her father's house and her mother's house, and at the time, the defendant was living with her mother. K.L. noted that her bedroom at her mother's house was upstairs and that she primarily used the upstairs bathroom. The defendant also occasionally used that bathroom. In the bathroom, there was an electrical outlet to the right of the sink, which was across from the shower. K.L. noted that there was a black, block charger with a small blue light on the side plugged into the outlet. K.L. indicated that the defendant was the only person in the house who used the charging block and that she believed that he used it to charge his vape stick.

¶ 8    K.L. also indicated that there was one laptop in the house, and that it belonged to the defendant. Once when she was using the laptop, she saw that there were several tabs on the browser opened to pornographic videos. She had seen pornography before that incident, as she began looking at sexual material on the internet when she was approximately nine years old. While living in her mother's house, she masturbated in the upstairs bathroom where she was alone. She did not believe that anyone in the house knew what she was doing, she did not video record herself, and she never thought that anyone was video recording her.

¶ 9    K.L. also testified about the previous recording incident in the downstairs bathroom. She indicated that as she was getting ready to shower, she observed the defendant's cell phone angled toward the shower and recording. When the defendant was confronted about the incident, he claimed that it was an accident and that he had to prop up the phone for the charger to work. K.L. noted that the defendant knew that she was getting ready to shower in that bathroom and had placed the phone in there to charge right before. However, at the time, K.L. and her mother believed that the recording was an accident.

4

¶ 10    On cross-examination, K.L. indicated that at the time of the CAC interview, she did not know about the allegations against the defendant and that those allegations were the reason for the interview. During that interview, K.L. never mentioned the charging block in the bathroom, as, at the time, she did not think it was important. However, after the interview, she was told about the videos of her in the bathroom and was asked about the charging block. In the interview, K.L. indicated that the defendant never did anything to make her feel uncomfortable and that the incident with the cell phone in the bathroom was an accident. K.L. acknowledged that she used the laptop that was in the house to download songs to her MP3 player.

¶ 11    N.L. testified that the defendant moved into her house sometime in 2021, and at the time, she was going through a divorce. She initially had limited time with her children, only seeing them one day per week. However, in September 2022, she was granted 50/50 custody after a hearing in which she and the defendant testified. She had one child with the defendant and that child was two years old. The defendant seemed to be a good father, and she never suspected that the defendant was recording her daughter.

¶ 12    On September 9, 2022, N.L. looked through the defendant's cell phone because he was acting suspicious and did not want anyone touching his phone. N.L. opened the defendant's email on his phone and discovered a video of K.L. in the upstairs bathroom getting undressed and entering the shower. N.L. then searched the defendant's laptop, as he was also being secretive with it and did not want anyone touching it. While looking through the files on the laptop, she discovered photographs zoomed in on K.L.'s buttocks. N.L. believed the photographs were taken while K.L. was watching movies in N.L.'s bedroom. N.L. also discovered videos of K.L. showering and masturbating, and it did not appear that K.L. knew someone was watching her. N.L.

5

used her cell phone to take photographs of the videos on the laptop because she wanted proof when she confronted the defendant.

¶ 13    N.L. did not believe that the videos were taken with a cell phone because the videos displayed timestamps. The State offered into evidence and published pictures that N.L. had taken with her cell phone of what she found on the defendant's laptop and in his email. Some of the photographs showed files which displayed the initials "ZR" for the defendant's name. N.L. explained that she took photographs of the videos, rather than recording them, because she was trying to avoid any pictures that showed K.L.'s unclothed body. N.L. downloaded the pictures to a Snapchat folder, as it was the only locked space she possessed, and then she deleted the pictures from her cell phone. The pictures' resolution quality was diminished by downloading them to the Snapchat folder.

¶ 14    When N.L. confronted the defendant about the videos, the defendant claimed that he "did those things because he had relapsed on methamphetamine." He did not tell N.L. what type of camera he had used to record K.L., but he claimed that he initially bought the camera for N.L. N.L. then told him to get out of the house and that she did not want him around her children. However, the defendant pretended that he needed to get something, like his phone, charger, or wallet, from inside the house. Subsequently, N.L. heard a crash and discovered the defendant on the ground outside one of the children's rooms and that the room's door and door frame had been broken. N.L. noted that the defendant was fixated on finding his computer, and he knew that the laptop was hidden inside the locked room. N.L. then made the defendant leave the house.

¶ 15    N.L. explained that she did not immediately contact the police because she was afraid of losing custody of her children, and that she wanted to think about how to handle the situation. She currently had not seen her children since September or November 2022. She acknowledged that,

6

even after she kicked the defendant out of the house, she remained in contact with him and did not report him to the police. The State offered into evidence and published text message exchanges between N.L. and the defendant from September 10, 2022, through September 13, 2022. In the text messages, N.L. told the defendant that she was letting him keep his employment and not drawing attention to his conduct because she did not want to lose custody of her children. N.L. also told him that he was lucky that she did not immediately contact the police and that she was undecided about reporting him. In those messages, she accused him of doing "something extremely disgusting and extremely f*** up," recording videos and taking pictures of children who had no idea that they were being recorded, being entertained at her daughter's expense, and having "horrible things" of her daughter on his computer. She also told him that she did not want him around their son until she had proof that he had gotten help. In response to the accusations, the defendant admitted that he had a bad drug problem and that he would seek help and do whatever it took to prove that their son was safe with him. However, he also replied that he was not admitting to the "bogus accusations," that he never did anything to N.L.'s children, and that he was not a child molester.

¶ 16    N.L. then testified that she texted the defendant that she had a job interview and told him the date and time of the interview (September 13 at 11 a.m.). When she returned home after the interview, she discovered that the defendant's laptop was missing from where she had hidden it under her bed. She believed that he used the spare key hidden under the doormat to get inside the residence. She accused the defendant in a text message of breaking into the house and stealing the computer. However, the defendant claimed that he had been at work all day. Realizing that the defendant would never change and that he could record someone else's child, she contacted the police.

7

¶ 17    N.L. testified that, during the time that the defendant lived with her, she was unemployed, and the defendant was their only source of income. She did not receive child support for the children that she had with her previous husband. After she kicked the defendant out of the home, she let him have contact with their son because she felt guilty because their son was crying and asking for his father. She acknowledged that she waited four days to report the defendant to the police, noting that she was shocked, scared, and did not know how to handle the situation.

¶ 18    N.L. testified that she searched the house for the camera that recorded the videos, and she eventually found the black box charger inside a black cup sitting on the sink in the upstairs bathroom. She explained that the camera was not noticeable, and she happened to glance down and see it. She noted that the camera was discreet, and she only saw it once she plugged the charger into the outlet. She did not look at any of the files on the camera, as she immediately called the police, and an officer picked the camera up from her house.

¶ 19    N.L. then testified about the previous instance where the defendant had recorded K.L. in the bathroom with his cell phone. She noted that this incident occurred one or two months before the incidents at issue. N.L. explained that when she was at the doctor's office, the defendant randomly messaged her that he had told K.L. to take a shower, so that it would be easier for N.L. to bathe the other children later. When N.L. returned home, K.L. said that she was getting ready to take a shower when she found the defendant's cell phone in the bathroom and that it was recording. K.L. was extremely uncomfortable about the situation. N.L. then questioned the defendant about it, and the defendant claimed that he was charging his phone in the bathroom and had forgotten to get it before K.L. went in there. He noted that he did not want to go into the bathroom to grab it because K.L. was showering and that his hand must have accidentally hit the record button. N.L. also asked K.L. if the defendant had done anything else to make her

8

uncomfortable, and K.L. said no. N.L. continued checking in with K.L., but it seemed like a misunderstanding because nothing further happened.

¶ 20    On cross-examination, N.L. acknowledged that her parenting time with the children was previously restricted after her ex-husband obtained an order of protection against her. She currently did not have custody of her children. She noted that she had questioned the defendant in person about the videos, and he had admitted it. However, she acknowledged that she never mentioned his admission in her text messages to him. After kicking the defendant out of the house, she let him return on approximately two occasions to see his son. When asked whether she had two pending felony charges and a charge for violating an order of protection, she refused to talk about the cases.

¶ 21    Jessica Edwards, the human resources manager at MotoRad of America, testified that the defendant worked at MotoRad in September 2022. However, the defendant was not at work on September 13, which was the day that N.L. claimed that he had broken into her house.

¶ 22    Eddie Johnson, a Mt. Carmel Police Department detective, testified that he had worked for the police department for over 19 years; he had 1,000 hours of ongoing training during his 19-year career; and as part of his training as a law enforcement officer, he received sex crime investigation training, including a trauma-informed response to sexual assault course and an investigator course. In his current role as detective, he primarily handled sex crimes, which included the investigation in this case. Detective Johnson began investigating the allegations against the defendant after N.L.'s September 13 report that the defendant had broken into her house and had taken a laptop. When Detective Johnson spoke to N.L., he learned the nature of the allegations against the defendant. During the investigation, N.L. turned over text messages between her and the

9

defendant, the photographs that she had taken of the defendant's laptop screen, and the charging block that she discovered in the bathroom.

¶ 23    Detective Johnson found two files on the SIM card that was in the USB hidden camera adapter. The first file was a text file, but the second file contained 78 soundless videos. Detective Johnson reviewed the videos and noted that the majority of them were of K.L. There were also videos of N.L. with her and the defendant's son and of K.L.'s sister, but the defendant was not in any of the videos. Detective Johnson indicated that the camera was motion activated in that it turned on when someone walked into the room. He noted that the videos appeared "very voyeuristic," as if the individuals on the recordings did not know they were being recorded. Detective Johnson believed that there were seven illicit videos of K.L. in the second file, and the date range for those videos was August 27, 2022, through September 3, 2022. The videos, which depicted K.L. masturbating in the upstairs bathroom, were played for the jury.

¶ 24    After learning about the accusations that the defendant had recorded K.L., Detective Johnson scheduled a forensic interview of K.L. with Nicole Bradfield at the Guardian Center. At the time of the interview, K.L. was not aware that videos had been taken of her. However, following the interview, K.L. asked Detective Johnson why the police were involved, and after discussing it with the professionals who were present, it was decided that her questions could be answered. When she learned that she had been recorded while in the bathroom, she became very upset and said that she was not aware that she was being recorded.

¶ 25    During the investigation, Detective Johnson interviewed the defendant twice, and both interviews were audio and video recorded. The first interview occurred on September 14, 2022, and although the defendant was not under arrest, he was given *Miranda* (*Miranda v. Arizona*, 384 U.S. 436 (1966)) warnings before questioning. According to Detective Johnson, in the interview,

10

which was not played for the jury, the defendant indicated that he believed that N.L. accused him of recording K.L. because he discovered that N.L. had an affair, and he told N.L. that he was going to seek custody of their son. He denied any knowledge of the missing laptop. He admitted lying to N.L. about being at work on September 13, the day the laptop went missing, but explained that he did not want to disappoint her because he had missed two days of work. He claimed that he was in Evansville with his mother that day. He did not remember the previous incident in the bathroom where his cell phone was recording K.L. During the interview, Detective Johnson manually searched the defendant's cell phone but did not find any pornographic images of children. However, the defendant had called Detective Johnson the evening before to schedule the interview, so the defendant knew about the interview before it occurred.

¶ 26    The second interview occurred on September 21, 2022, after the defendant was arrested. The video of this interview was played for the jury. In this interview, the defendant denied any knowledge of the charging block or the missing laptop. He admitted that the previous incident with his cell phone occurred, but he noted that there was no video taken.

¶ 27    Detective Johnson testified that during the second interview, the defendant was visibly upset and crying. Detective Johnson noted that the defendant's story and demeanor changed in this interview. Detective Johnson explained that part of the process of conducting an interview was observing verbal and physiological clues to determine the person's honesty. He indicated that there was a point toward the beginning of this interview where he provided the defendant with inaccurate information, and the defendant looked him in the eyes and denied that it ever happened. However, Detective Johnson noted that when the defendant was later confronted with the videos and evidence that was found, the defendant did not look Detective Johnson in the eyes and instead turned away and covered his face, while denying his involvement. Detective Johnson noted that

11

although the defendant briefly turned and looked him in the eyes, the defendant never addressed the specific issue while looking at him. Detective Johnson explained that when an innocent person was accused of a crime, that individual's reaction was usually much different than the defendant's reaction. Detective Johnson noted that the innocent person was generally more confrontational, especially when they were being accused of a sex crime. Detective Johnson believed that the defendant's crying was genuine in the sense that the defendant was in jail, as that was a common reaction for someone in jail. However, Detective Johnson explained that the defendant's reaction did not seem appropriate for an innocent person being accused of that type of crime. Thus, Detective Johnson opined that the defendant was being deceptive.

¶ 28    Sheryl Woodham, the executive director of the Guardian Center, which was a child advocacy center, testified that she conducted K.L.'s forensic interview. The interview was recorded, and the entire interview was played for the jury. Defense counsel did not object to the State playing the interview. In the interview, Woodham asked K.L. whether K.L. knew why she was there, and K.L. responded that she had a hunch that Woodham wanted to find out whether she felt safe at home or whether she wanted to live with her mother or father. Woodham questioned K.L. to determine whether K.L. had ever been inappropriately touched, but K.L. indicated that she had not. K.L. noted that the defendant hugged her from the side because he wanted her to feel safe.

¶ 29    Also in the interview, K.L. discussed the incident where the defendant had recorded her while she was getting ready to shower. She explained that the defendant's cell phone had to be at a certain angle to charge, so the defendant had propped the phone up, and the phone started to accidentally record. However, before she undressed, she checked the phone and noticed it was recording. When she told the defendant that the phone was recording, he explained that it was an accident. K.L. also told her mother about the incident, and both K.L. and her mother believed the

12

incident was an accident. K.L. noted that there were no other incidents with the defendant that made her feel uncomfortable, so she was positive that this incident was an accident. She also noted that there were no other times that the defendant's phone was charging in the bathroom while she was in there. She further noted that the defendant used the laptop the most, and she only used it to add music to her MP3 player.

¶ 30 Woodham then testified that K.L.'s interview was different from the average interview because K.L. did not necessarily know or understand why she was there. After the interview, K.L. was told about the videos of her in the bathroom. K.L. was extremely upset and mortified that someone had recorded her in the bathroom and called the images "disgusting." Woodham did not believe that K.L. was aware of the videos and images before being told. The State then rested, and the defendant presented no evidence. After hearing closing arguments and jury instructions, the jury found the defendant guilty of eight counts of child pornography.

¶ 31 On January 29, 2024, the trial court held the sentencing hearing, at which the parties disagreed as to the applicable sentencing range. The State argued that for offenses committed as part of a single course of conduct, the aggregate maximum sentence was limited to the maximum term for the two most serious felonies involved. Thus, the State argued that if the convictions for the first seven charges were considered the same course of conduct, then the maximum sentence would be 120 years. The State then contended that the conviction based on count VIII was a separate course of conduct, as the defendant had transferred a video to the laptop, and the image was created from that transferred video. The State argued that the maximum sentence for that standalone conviction was 30 years. Therefore, the State argued that the sentencing range for both convictions was 18 to 150 years. In response, defense counsel argued that if the conviction on count VIII was considered a separate offense, the sentencing range was 12 to 60 years, as the

13

defendant was not eligible for extended range sentencing. However, defense counsel argued that count VIII should not be considered a separate course of conduct because it was based on the same type of video that was found on the charging block.

¶ 32    After hearing counsels' arguments, the trial court noted that based on *People v. Myrieckes*, 315 Ill. App. 3d 478 (2000), and section 5-8-4(f)(2) of the Unified Code of Corrections (730 ILCS 5/5-8-4(f)(2) (West 2022)), the maximum sentence was 120 years. The trial court found that all eight counts were part of the same course of conduct, *i.e.*, placing the camera, reviewing the videos and photographs, and making the still image. The trial court then sentenced the defendant to two consecutive terms of 30 years in IDOC for two counts of child pornography based on one course of conduct. On February 6, 2024, the defendant filed a timely notice of appeal.

¶ 33                                    II. ANALYSIS

¶ 34    Before addressing the merits of this appeal, we note that we took with the case the defendant's motions for leave to cite additional authority filed on November 4, 2025, and December 10, 2025. The defendant seeks leave to cite *People v. Covalt*, 2025 IL App (5th) 220346, and *People v. Tellor*, 2025 IL App (5th) 230096-U, which were published after the parties submitted their briefs. We now grant the defendant's motions to cite additional authority.

¶ 35    On appeal, the defendant contends that (1) the trial court committed plain error in admitting the CAC video of K.L., or alternatively, his trial counsel provided ineffective assistance in failing to object to the admission of this video into evidence; (2) the State elicited improper expert witness testimony from Detective Johnson, or alternatively, his trial counsel provided ineffective assistance in failing to object to this testimony; (3) the defendant was only subject to one child pornography conviction under the principle of unit of prosecution; (4) his multiple child pornography convictions violate the one-act, one-crime rule; (5) his 60-year sentence should be

14

vacated, and the cause remanded for resentencing, because the trial court used the wrong sentencing range when determining his sentence; and (6) his sentence was excessive.

¶ 36                              A. Admission of CAC Video

¶ 37    The defendant argues that the CAC interview video was inadmissible hearsay with no applicable hearsay exception and was highly prejudicial. In making this argument, the defendant acknowledges that he has forfeited review of this issue because he failed to contemporaneously object and raise the issue in his posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), but argues that we should review the issue under the first prong of the plain-error doctrine.

¶ 38    The plain-error rule is a narrow and limited exception to the general rule of forfeiture. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). Under the plain-error doctrine, a reviewing court will review an unpreserved error when a clear and obvious error occurs and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant; or (2) the alleged error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The first step in the plain error analysis is determining whether an error occurred. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008). However, we conclude that, even if an error existed in the present case, the first prong of the plain-error doctrine does not apply because the evidence was not closely balanced.

¶ 39    In determining whether the evidence at trial was closely balanced, the reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53. This inquiry involves an assessment of the evidence on the elements of the charged offense as well as any evidence regarding the witnesses' credibility. *Id.* Prejudice rests not on the seriousness of the error but on

15

the closeness of the evidence. *Id.* ¶ 68. The evidence must not only be closely balanced but must be so closely balanced that the error alone threatened to tip the scales of justice against defendant. *People v. Mueller*, 2015 IL App (5th) 130013, ¶ 25. Evidence may be closely balanced where there are credible, opposing versions of events, and no extrinsic evidence was presented to corroborate or contradict either version. *Sebby*, 2017 IL 119445, ¶ 63. The defendant bears the burden to establish that the evidence was closely balanced. *Mueller*, 2015 IL App (5th) 130013, ¶ 25.

¶ 40 In contending that the evidence was closely balanced, the defendant notes that (1) the State was unable to connect the video material found in the hidden camera to the defendant, as there was no evidence that the defendant placed the recording device in a bathroom that the entire family had access to; (2) the State was unable to provide any explanation for why, if the defendant had returned to N.L.'s home for his laptop, he left the hidden camera behind; (3) although the State introduced a blurry image of K.L. in the shower that N.L. asserted she photographed from the defendant's laptop, the State did not introduce that laptop into evidence; (4) the evidence established that N.L. was a vulnerable witness, as she had a history of criminal arrests and pending criminal charges, and had a motive to shift the blame because she had just regained custody of her children; and (5) the case against the defendant hinged on N.L.'s credibility.

¶ 41 However, in the context of the specific charges and the evidence pertaining to those charges, a commonsense assessment of the evidence reveals that the evidence was not so close that the error, by itself, threatened to tip the scales of justice against the defendant. N.L. testified that she discovered, on the defendant's laptop, files containing images and videos of K.L. masturbating. N.L. then took photographs of those images and videos to document their existence. N.L.'s photographs of the defendant's laptop screen were from the same vantage point as the camera discovered in the bathroom. Also, N.L. testified that some of the photographs that she had taken

16

of the laptop screen showed computer files that displayed the initials "ZR" for the defendant. N.L. also testified that she discovered the black hidden camera in a black mug on the bathroom countertop and that it was a discreet camera and not noticeable in the cup.

¶ 42    In addition, N.L. testified that when she confronted the defendant with what she had found, he verbally admitted to recording K.L. in the bathroom and subsequently attempted to retrieve his laptop by breaking down the bedroom door where he believed the laptop was hidden. Further, the evidence revealed that when N.L. confronted the defendant about later breaking into her house and stealing the laptop, he lied about being at work at the time. Although the defendant contends N.L. had a motive to shift the blame for the incident, that argument is unpersuasive, as the evidence revealed that N.L. was the only person, other than presumably the defendant, who knew about the images and videos on the laptop, as well as the hidden camera, and she turned everything over to the police.

¶ 43    Further, K.L. corroborated that there was a black block charger with a small blue light on the side plugged into the bathroom outlet, and she believed that the defendant was the only person in the house who used that charging block. She also indicated that there was one laptop in the house, and that it belonged to the defendant. At one point when she was using the laptop, she observed that there were several tabs on the browser opened to pornographic videos. In addition, both N.L. and K.L. testified about the previous incident where, immediately before K.L. was going to shower, K.L. noticed that the defendant's cell phone, which was charging in the bathroom, was angled toward the shower and was recording. K.L. noted that the defendant placed the cell phone on the bathroom charger right before she went in there to shower. Also, N.L. testified that right before the incident, the defendant had randomly messaged her that he had told K.L. to take a shower.

17

¶ 44    Finally, Detective Johnson, who saw the files on the hidden camera, corroborated N.L.'s testimony about the hidden camera's location. Detective Johnson noted that the hidden camera contained videos of K.L., as well as videos of other family members entering and exiting the bathroom, and that the only person that was not captured on the video was the defendant. Detective Johnson indicated that the individuals captured on the recordings appeared unaware that they were being recorded. Also, during Detective Johnson's first interview with the defendant, the defendant claimed that he was kicked out of N.L.'s house because he discovered that she was having an affair, he denied any knowledge of the previous incident where his cell phone was recording in the bathroom, and he admitted that he lied to N.L. when he told her that he was working the day the laptop went missing. In the second interview, however, the defendant admitted that the previous recording incident had occurred.

¶ 45    Thus, despite the defendant's assertions, we find that, based on the above, the evidence at trial was not closely balanced. Because the defendant failed to meet his burden of demonstrating plain error, reversal is not warranted on the basis of the admission of the CAC interview.

¶ 46    Alternatively, the defendant argues that his trial counsel provided ineffective assistance by failing to object to the admission of the CAC interview at trial. Criminal defendants have a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). To establish ineffective assistance of counsel, a defendant must prove that (1) his counsel's performance fell below an objective standard of reasonableness; and (2) absent counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *People v. Holt*, 2019 IL App (3d) 160504-B, ¶ 46. The court need not consider the deficiency prong where the defendant fails to establish prejudice under the second prong of the *Strickland* standard. *Id.*

¶ 47    A reviewing court's analysis of *Strickland* prejudice is similar to the analysis of the first prong of plain error. *Id.* ¶ 47. We have already determined that the defendant cannot establish plain error under the first prong, as the evidence against the defendant was not closely balanced. Thus, we likewise hold that the defendant cannot satisfy the prejudice prong of the *Strickland* inquiry. See *id.* There is no reasonable probability that the outcome of the defendant's trial would have been different had defense counsel objected to the admission of the CAC interview at trial. Accordingly, we reject the defendant's ineffective assistance of counsel claim.

¶ 48                    B. Police Officer Expert Testimony

¶ 49    The defendant next argues that the State elicited improper expert witness testimony from Detective Johnson regarding the defendant being deceptive in the defendant's police interviews. Similar to his argument concerning the admission of the CAC interview, the defendant acknowledges that he has forfeited review of this issue because he failed to contemporaneously object and raise the issue in his posttrial motion (see *Enoch*, 122 Ill. 2d at 186). However, he again argues that we should review the issue under the first prong of the plain-error doctrine.

¶ 50    As already noted, under the plain-error doctrine, a reviewing court will review an unpreserved error when a clear and obvious error occurs and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant; or (2) the alleged error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *Piatkowski*, 225 Ill. 2d at 564-65. As we have already determined that the evidence at trial was not closely balanced, we find that the defendant failed to meet his burden of demonstrating plain error here.

¶ 51    Alternatively, the defendant argues that his trial counsel provided ineffective assistance in failing to object to this testimony at trial. However, as we have already determined that the

evidence against defendant was not closely balanced, we conclude that the defendant cannot satisfy the prejudice prong of *Strickland*. See *Holt*, 2019 IL App (3d) 160504-B, ¶ 47. There is no reasonable probability that the outcome of the defendant's trial would have been different had defense counsel objected to Detective Johnson's trial testimony about the defendant being deceptive. Thus, we again reject the defendant's ineffective assistance of counsel claim.

¶ 52                              C. Unit of Prosecution

¶ 53     The defendant argues that seven out of his eight child pornography convictions should be vacated because the child pornography statute does not authorize more than a single conviction for capturing a single, continuous stream of video. The defendant argues that the State only presented evidence from which the jury could infer a single act of placing a motion-activated video camera that automatically produced continuous images that captured multiple sexual acts. Thus, the defendant contends that only a single conviction is permitted.

¶ 54     The question of whether more than one conviction is authorized under the unit of prosecution rule is a separate legal issue from the question of whether multiple convictions violate the one-act, one-crime rule. However, the threshold inquiry of the one-act, one-crime rule is to determine the unit of prosecution of the offense. *People v. Hartfield*, 2022 IL 126729, ¶ 67. "The unit of prosecution of an offense refers to what act or course of conduct the legislature has prohibited for purposes of a single conviction and sentence." *Id.* In arguing that the child pornography statute authorizes only a single conviction in this case, the defendant cites this court's decision in *People v. Covalt*, 2025 IL App (5th) 220346. In that case, the defendant was charged, among other things, with three counts of child pornography based on the same single filming of two juveniles. *Id.* ¶¶ 3, 150. The question in *Covalt* was whether defendant committed the offense

of child pornography one or multiple times with the single filming. *Id.* ¶ 137. The relevant section of the child pornography statute at issue in *Covalt* was as follows:

> "(a) A person commits child pornography who:
>
> > (1) films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction or depicts by computer any child whom he or she knows or reasonably should know to be under the age of 18 or any person with a severe or profound intellectual disability where such child or person with a severe or profound intellectual disability is:
>
> > > * * *
>
> > > (vii) depicted or portrayed in any pose, posture or setting involving a lewd exhibition of the unclothed or transparently clothed genitals, pubic area, buttocks, or, if such person is female, a fully or partially developed breast of the child or other person[.]" 720 ILCS 5/11-20.1(a)(1)(vii) (West 2020).

*Covalt*, 2025 IL App (5th) 220346, ¶ 140.

¶ 55    In determining the unit of prosecution, this court noted that there was no question that the legislature knew how to define the unit of prosecution, as evidenced by the fact that the child pornography statute provided an express definition regarding possession of child pornography (see 720 ILCS 5/11-20.1(a-5) (West 2020)). However, the court found that there was no express definition of the unit of prosecution in the child pornography statute for a violation based on filming, photographing, and reproducing. *Covalt*, 2025 IL App (5th) 220346, ¶ 141. Looking at the above statutory language, this court found that the statute included a base act, *i.e.*, the filming

21

or photographing, and the specifics that would make such act criminal, *i.e.*, the lewd exhibition of any child's unclothed genitals, pubic area, buttocks, or breasts. *Id.* ¶ 145.

¶ 56 Thus, this court concluded that the statute appeared to criminalize each filming, photographing, or reproducing but also appeared to criminalize each lewd exhibition of the statutorily specified body parts of any juvenile. *Id.* In other words, the court noted that it was possible that the unit of prosecution for the offense depended on the number of times defendant filmed, photographed, or reproduced. *Id.* ¶ 149. However, the court noted that it was equally possible that the unit of prosecution depended on the number of juveniles or lewd exhibitions depicted. *Id.* As such, the court could not find that the legislature unambiguously delineated the unit of prosecution. *Id.* Thus, the court applied the rule of lenity and resolved the ambiguity in defendant's favor, finding that "a single filming, photographing, or depicting any number of juveniles by other means [would] sustain only one conviction." *Id.* Accordingly, this court vacated two of the relevant three convictions for child pornography, as the single filming only sustained one conviction. *Id.* ¶ 150.

¶ 57 Similar to *Covalt*, the defendant in this case was convicted of child pornography based on filming, video recording, photographing, or otherwise depicting child pornography. Thus, consistently with *Covalt*, we conclude that, under the child pornography statute, a single filming can only sustain one conviction. Accordingly, we must determine whether, as in *Covalt*, there was only a single filming in this case.

¶ 58 The defendant acknowledges that he is not arguing that the State would be unable to separately prosecute separately filmed videos. However, the defendant contends that the State's prosecution was based on a single video that continually recorded inside the hidden camera. The defendant argues that nothing in the statute suggests that the legislature intended for the

22

prosecution to be able to separate a single video into individual, illicit acts captured by the camera and separately charge each one. In response, the State argues that while *Covalt* involved a single, continuous filming of the two minor victims, the recordings in this case consisted of multiple, separate, and distinct video recordings. We agree with the State's position.

¶ 59     The recordings in this case were from a motion-activated camera placed in the bathroom. The hidden camera started recording when motion was detected and stopped recording after a period of time when motion was no longer detected. The hidden camera contained a mini-SIM card, which contained 78 video clips of the various members of the family in the bathroom. The child pornography convictions on counts I through VII were based on seven different videos taken of K.L. from August 27, 2022, through September 3, 2022, that were contained on the mini-SIM card. Those videos were taken on different dates and/or at different times, and in between some of the video clips, other videos were taken of family members entering and exiting the bathroom during that time period. In addition, while counts I through VII were based on videos depicting K.L. masturbating, count VIII was based on a still image of a video that depicted K.L.'s unclothed buttocks in the shower. Thus, based on the above, we find that there was not a single filming here, and the defendant's convictions should not be vacated pursuant to the unit of prosecution rule.

¶ 60                              D. One-Act, One-Crime Rule

¶ 61     Alternatively, the defendant argues that under the one-act, one-crime doctrine, his eight convictions should be merged into one conviction because they were based on the single act of placing a motion-activated camera in the bathroom. The defendant admits that some of the video segments were recorded on different days but argues that there was no evidence demonstrating that any additional physical act was required to start each video segment, several of which were only minutes apart. Instead, the defendant notes that the hidden camera automatically recorded any

23

moving object that entered the bathroom. Thus, the defendant contends that the camera remained plugged into the outlet, it continuously recorded the video material that the State used to charge the defendant, and the recording continued without any physical interruption. In addition, the defendant argues that the still image that supported count VIII stemmed from the same hidden camera as the videos and was thus part of the same act of videotaping that supported the other counts. Although the defendant acknowledges that he failed to make this argument in the trial court, he nevertheless requests that we review it under the second prong of the plain-error doctrine.

¶ 62    Forfeited one-act, one-crime violations fall within the second prong of the plain-error rule because they implicate the integrity of the judicial process. *People v. Hagler*, 402 Ill. App. 3d 149, 152 (2010). Under the one-act, one-crime rule, a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). An act, when used in this context, refers to any overt or outward manifestation that will support a different offense. *Id.* at 188. When determining whether a defendant's conduct consisted of a single act, appellate courts have considered the following six factors: (1) the existence of an intervening act or event, (2) the time interval between successive parts of defendant's conduct, (3) the identity of the victim, (4) the similarity of the acts performed, (5) whether the conduct occurred at the same location, and (6) prosecutorial intent as reflected in the charging instrument. *Id.* Whether a violation of the one-act, one-crime rule has occurred is reviewed *de novo*. *Hagler*, 402 Ill. App. 3d at 152.

¶ 63    In this case, the act is not, as argued by the defendant and as found by the trial court, the placing of the motion-activated hidden camera in the bathroom. Instead, we find that the act is the actual recording of the activity that is prohibited from being recorded under the child pornography statute. In making this decision, we acknowledge the defendant's position that the hidden camera

24

remained plugged into the wall outlet when all of the videos were recorded and did not require the defendant to do anything additional to start the various recordings. However, the recordings were not a single, continuous recording, as the camera was activated by motion and then stopped recording once the motion was no longer detected. The defendant selected, utilized, and controlled the technology to record separate images and separate incidents on separate occasions. While there is certainly a common act in the same location, the recording of K.L. in the bathroom, the recordings produced distinct, noncontinuous videos over a period of days that were, at times, interrupted by the recordings of others who inadvertently activated the hidden camera by entering the bathroom. The fact that these acts were closely related does not implicate the one-act, one-crime doctrine. See *People v. Reyes*, 2020 IL App (2d) 170379, ¶ 86 (finding that even though the acts were closely related, the defendant produced two distinct pornographic images by recording the victim's vagina and a penis touching the victim's vagina). Thus, we find that the defendant's argument lacks merit.

¶ 64    In summary, we conclude that the trial court erred in finding that there was a single course of conduct for the defendant placing the camera in the bathroom. Consequently, this finding requires us to vacate the defendant's sentence and remand for resentencing. However, in making this decision, we want to make clear that we are not finding that none of the defendant's convictions could merge. Instead, we are only finding that there was not one single course of conduct, as initially found by the trial court. Thus, on remand for resentencing, the trial court should make a factual determination as to which, if any, of the convictions should merge for sentencing purposes. Because we remand for resentencing, we need not reach the defendant's remaining arguments as to his sentence.

25

¶ 65                    III. CONCLUSION

¶ 66    For the reasons stated, we affirm in part the judgment of the circuit court of Wabash County as to the admission of certain evidence at trial. However, we vacate the defendant's 60-year sentence and remand for resentencing consistent with this decision.

¶ 67    Affirmed in part and vacated in part.

¶ 68    Cause remanded.